IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHUSTER'S BUILDERS SUPPLIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 04-1585 |
| | ) | |
| PEACHTREE DOORS AND WINDOWS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**Opinion**

Shuster's Builders Supply, Inc. ("Shuster's") brings this action for breach of contract and breach of duty of good faith and fair dealing against Peachtree Doors and Windows, Inc. ("Peachtree"). Shuster's, a Pennsylvania Corporation, originally filed this action in the Court of Common Pleas of Westmoreland County. Peachtree, a Tennessee Corporation, removed the action to federal court on October 15, 2004, based on diversity of citizenship. Shuster's is a building supply manufacturer and was the exclusive distributor of Peachtree Doors and Windows from 1996 until January 2004 when the relationship ended. Shuster's alleges that Peachtree breached an oral agreement between the parties when it terminated the relationship without advance notice and in bad faith.

Presently before the court is Defendant Peachtree's Motion for Summary Judgment (Doc. 11). For the reasons stated below, we will grant Defendant's motion.

## I. GENERAL BACKGROUND

The following is a factual summary of this case taken from the parties' statements of material fact, with any factual disputes indicated by reference to the parties's pleadings.

Schuster's is a building supply manufacturer offering windows, doors, stairs, and similar products primarily to retail building supply businesses. In 1996, Shuster's entered into an oral distribution agreement ("Distributor Agreement") with Peachtree making Shuster's the exclusive distributor of certain Peachtree product lines in Western and Central Pennsylvania, Ohio, Western New York, and West Virginia. Shuster's sold three primary categories of Peachtree products: windows, patio doors, and entry doors.

At its outset, the Distributor Agreement did not provide for a specific period of duration, nor did it provide for conditions under which the Agreement could be terminated. Peachtree asserts that the Distributor Agreement lacked a specific period of duration or conditions for termination. Peachtree's Statement of Material Facts, at ¶ 5, citing Deposition Testimony of Anthony Shuster, at 18-19 and Deposition Testimony of James Vogel, at 32-33.) Shuster disputes this assertion and instead claims that the "continuing" Distributor Agreement did provide "for a specific period of duration [and] terms of termination." (Shuster's Responsive Concise Statement, at ¶ 5.)

From 1996 until 1999, Shuster's purchase volume of Peachtree products steadily increased. However, in 2000, sales began to decline and continued to steadily decline until the parties' relationship ended. Shuster's overall purchases of Peachtree products steadily declined during this time period, as follows:

| Year | Overall Amount |
|---|---|
| 1999 | $8,635,082 |
| 2000 | $8,292,536 |

| | |
|---|---|
| 2001 | $6,612,409 |
| 2002 | $6,884,288 |
| 2003 | $5,930,804 |

Shuster's purchase of Peachtree entry doors also saw a steady decline from 1997 through 2003, as follows:

| Year | Entry Door Amount |
|---|---|
| 1997 | $915,481 |
| 1998 | $880,301 |
| 1999 | $775,477 |
| 2000 | $771,106 |
| 2001 | $554,928 |
| 2002 | $502,685 |
| 2003 | $353,517 |

A contributing factor to the decline in purchases was the loss of one of Shuster's key Peachtree customers, O.C. Cluss, during the period of time that Shuster's sales of Peachtree products declined.

In the summer of 2003, in addition to the objective decline in sales of Peachtree products by Shuster's, Peachtree maintains that it began to experience other difficulties with Shuster's affecting its business. In particular, Peachtree claims that Shuster's sold a disproportionate amount of competitor's entry door products, including one assembled by Shuster's itself, making Shuster a direct competitor. (Peachtree's Statement of Material Facts, at ¶¶ 10 & 11.) Peachtree also asserts that Peachtree wanted Shuster to maintain certain amounts and types of Peachtree products in its inventory in order to improve Shuster's performance but Shuster's disagreed. (Id. at 14 & 15.) Peachtree also claims that Shuster's loss of O.C. Cluss as a customer not only contributed to the drop in sales, but also that the loss was entirely avoidable if Shuster's had handled the situation in a different manner. (Id. at ¶ 18.)

According to Shuster's, the decline in sales and purchases had nothing to with Shuster's actions. (Shuster's Responsive Concise Statement, at ¶¶ 7,8, & 9.) Shuster's denies that it sold a disproportionate amount of competitor's entry door products or that it was in direct competition with Peachtree's doors. (Id. at ¶¶ 10 & 12.) According to Shuster's the decline in sales was due to a manufacturing change in styles of doors manufactured by Peachtree. (Id. at ¶ 7.) Likewise, Shuster's asserts that the decline in purchases was due to the loss of the O.C. Cluss account, and to Shuster's decision to not to continue to purchase Peachtree's commercial builder-grade doors, since they were too expensive. (Id. at ¶¶ 8, 9.)

Shuster's also claims that the downward trend in Shuster's purchases of entry door products was due to a decision to maintain limited inventory to accommodate the rapidly changing manufacturing changes in Peachtree's products. (Id. at ¶¶ 12, 14.) For the same reason Shuster's did not carry Peachtree products in inventory that Peachtree requested. (Id. at ¶ 15.) Moreover, Shuster's claims that Peachtree's representative Howard Shocklin was in agreement with this inventory decision. (Id. at ¶¶ 12, 14 15.)

Shuster also disagrees with Peachtree's assertion that the loss of O.C. Cluss as a Shuster customer was avoidable. Instead, Shuster's claims that O.C. Cluss quit purchasing from Shuster's in retaliation for Shuster's declining to donate $7,000 to an O.C. Cluss grand opening promotion. (Id. at ¶ 18.)

On January 8, 2004, Peachtree and Shuster's met at Shuster's offices to discuss the resolution of outstanding issues and to discuss ways to increase business for 2004. Present at the meeting for Peachtree were Mike Farris, Mark Shields, Chris Brown, and Howard Schocklin.

Representing Shuster's at the meeting were Anthony Shuster, Leni Shuster, Daniel Miller, James Vogel, Tom Comini and Jim Skolnik.

According to Peachtree the actions at, and subsequent to, the January 8, 2004 meeting left Peachtree with the impression that Shuster's was no longer a Peachtree distributor. (Peachtree's Statement of Material Facts, at ¶ 20.) Peachtree claims that after the meeting Shuster's cancelled a Peachtree training session and promotional meeting. (Id. at ¶ 21.) Thus, Peachtree concluded that Shuster's was intending to end the distribution relationship. (Id. at ¶ 22.)

Based on this belief Mike Farris called Anthony Shuster on January 16, 2004. (Id. at ¶ 23.) According to Peachtree, Mike Farris and Anthony Shuster mutually agreed during this conversation to terminate the distributorship relationship and mutually agreed upon an exit plan. (Id. at ¶ 25.) In a letter from Mike Farris to Anthony Shuster dated January 19, 2004, Mike Farris stated his understanding of the mutually agreed termination of the parties' relationship and the mutually agreed upon exit plan. (Id.)

Shuster's denies that its actions at the meeting left Peachtree with the impression that Shuster's was no longer a Peachtree distributor. (Shuster's Responsive Concise Statement, at ¶ 20.) Shuster's also denies that it cancelled a Peachtree training session and promotional meeting. (Id. at 21). Shuster's explains that one of its representatives, Dan Miller, called Mark Shields of Peachtree regarding scheduling the training, but Mark Shields did not respond to the calls. (Id.). Shuster's also denies that Mike Farris was responding to Shuster's termination of the distributor relationship when he telephoned on January 16, 2004. (Id. at 23.) With respect to Mike Farris' January 19, 2004 letter, Shuster's denies that all of the details of the parties' telephone conversation were confirmed

in the letter. (Id. at 24.) Specifically, Shuster's denies that the parties mutually agreed to terminate their relationship.

Despite the disagreements, it is undisputed that Anthony Shuster never contacted Mike Farris to indicate that he disagreed with the contents of the January 19, 2004 letter; the remaining affairs of the parties' relationship were wrapped up pursuant to the terms of the January 19, 2004 letter; and until the instant Complaint was filed on September 14, 2004, no one from Shuster's indicated to Peachtree personnel that Shuster's disagreed with the termination of the relationship, or that Shuster's believed that the relationship could not be terminated.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c), Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment may be granted only if the moving party establishes that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. Summary judgment is appropriate only when the record evidence could not lead a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248-249 (1986). In evaluating a motion for summary judgment the court does not weigh the evidence or make credibility determinations. Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000). Rather than evaluating the evidence and determining the truth of the matter, the court determines whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In reviewing the evidence, the court

draws all reasonable inferences in favor of the non-moving party. Reeves, 120 S.Ct. at 1210; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

Once the party moving for summary judgment has satisfied its initial burden of production on the motion, then the burden shifts to the party opposing the motion. The party must set forth specific facts to show that there is a genuine issue for trial. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and has an affirmative duty to produce evidence demonstrating the existence of a factual dispute. Matsushita, 475 U.S. at 586. The court must evaluate the entire setting of the case, including the record and all materials submitted in accordance with the motion for summary judgment; whether it is clear that a trial is unnecessary; and whether there is any doubt as to the existence of a genuine issue for trial. Celotex, 477 U.S. at 324-25.

## III. DISCUSSION

Peachtree first argues that Shuster's breach of contract claims fails as a matter of law because the Distributor Agreement was terminable at will. Second, Peachtree moves for summary judgment on Shuster's claim of a breach of a duty of good faith and fair dealing arguing that such a duty does not apply to a contract terminable at will. Finally, Peachtree argues for dismissal of Shuster's claim of a breach of a duty of good faith and fair dealing because Pennsylvania does not permit such a claim when the underlying supporting facts of the claim also form the supporting basis for an alleged breach of contract claim.

In response, Shuster's argues that a genuine issue of material fact exists regarding whether the Distributor Agreement was terminable at will. Specifically, Shuster's argues that despite the lack of an express condition on termination of the Agreement, under the circumstances of this case

the law necessarily implies an agreement by the parties rendering the Agreement not terminable at will. Finally, Shuster's argues that its claim of breach of good faith and fair dealing arises out of the nature of the distributorship agreement and Peachtree had an independent contractual duty to act in good faith.

Before addressing the substance of these arguments, we will first resolve the parties' disputed issues of fact.

**A. Genuine Issues of Material Fact**

Shuster's argues that its alleged genuine issues of material fact preclude summary judgment. When a motion for summary judgment is made, the non-moving party may not simply rest on the allegations, but must prove affirmatively that an issue of material fact does exist between the parties. Fed. R. Civ. P. 56(e). "Material facts" are defined only as those that are likely to affect the outcome of the case under the applicable law. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. Shuster's has not met it burden.

In Shuster's responsive concise statement of facts it does sets forth its disagreements with Peachtree's assertions of fact. Unfortunately, Shuster's also uses the call and response of the statements of fact required by our Local Rule 56.1(B)(1) as a framework to, for the most part, argue its position rather than present a concise statement of essential facts supported by citation to the record evidence. Where Shuster's does cite to the record evidence it either cites to evidence that does not support its assertion or, more often, casts too wide a net by asking the Court to "refer to the complete copy of the full transcripts" of various deposition witnesses. (See Schuster's Responsive Concise Statement.) However, it is not the Court's responsibility to scour the record

searching for evidence to support a party's position. We will now examine these alleged genuine issues of material fact.

**1. Duration and Termination Terms of the Agreement**

Peachtree asserts that the Distributor Agreement lacked a specific period of duration or conditions for termination and supports its assertion by citing to specific deposition testimony of Anthony Shuster and James Vogel. (Peachtree's Statement of Material Facts, at ¶ 5, citing Deposition Testimony of Anthony Shuster, at 18-19 and Deposition Testimony of James Vogel, at 32-33.) In purporting to deny this fact Shuster's cites to "the complete copy of the full transcripts of Anthony Shuster and Jim Vogel, . . ." (Shuster's Responsive Concise Statement, at ¶ 5.) More helpfully, Shuster's does go on to specifically cite to Anthony Shuster's deposition testimony at pages 8 through 19, but does not develop its argument any further. (Id. (no specific citation to Vogel's testimony is given).) In reviewing Anthony Shuster's deposition pages we can find no testimony that would even remotely support Shuster's assertion. This is unsurprising in light of the fact that Anthony Shuster's testimony, as well as James Vogel's testimony, supports Peachtree's assertion. Thus we find that there is no genuine issue of material fact as to whether the parties' agreement provided for a specific period of duration or conditions for termination. It did not.

We characterize Shuster's response to Peachtree's statement of fact as a "purported denial" because Shuster's is in fact not denying Peachtree's statement of fact, but is instead arguing a question of law more properly reserved for a brief. Generally, Shuster's argument is that over time the parties' agreement was modified so that terms of duration or conditions for termination must be implied. We address that argument below, but it does not change the fact that Shuster's own

witnesses testified that the parties had no agreement as to the duration of their contract and no conditions under which a party could terminate the agreement.

**2. Difficulties with the Parties' Relationship**

As set forth above, Peachtree asserts that it began to experience other difficulties with Shuster's affecting its business, to which Shuster's responded with denials. Again, Shuster's supports its assertions by generally referring the Court to "the complete copy of the full transcripts of Anthony Shuster, Jim Vogel, Thomas Comini, and Leni Shuster . . . ." (See Shuster's Responsive Concise Statement, at ¶¶ 7-10, 12-15, & 18.) Needless to say these global citations are meaningless.

Shuster's does also cite to specific parts of the record to support its denials of Peachtree's assertions and to support its own assertions of contrary fact. To the extent that the cited evidence supports Shuster's positions it would create a disputed issue of fact, but we conclude that any facts that can be characterized as disputed in this case are not "material facts" as they are not likely to affect the outcome of the case under the applicable law. Anderson, 477 U.S. at 248. A disputed fact is not "material" if we accept as true the plaintiff's version of the fact and still reach the same conclusion under the applicable law. Id. Thus, for purposes of this motion we accept as true Shuster's allegations that the decline in sales and purchases had nothing to with Shuster's actions and were explained by the reasons Shuster's proffers. None of these facts are material to our determination that summary judgment is appropriate as a matter of law. Thus, even accepting Shuster's facts, we would still reach the same result.

### 3. The January 8, 2004 Meeting

We reach the same result with respect to Shuster's argument that genuine issues of material fact exist regarding the January 8, 2004 meeting and subsequent events. Thus, for purposes of this motion we accept as true that Shuster's actions at the meeting did not leave Peachtree with the impression that Shuster's was no longer a Peachtree distributor; that Shuster's did not cancel a Peachtree training session and promotional meeting; that Mike Farris did not telephone Anthony Shuster in response to the alleged termination of the distributor relationship by Shuster's; that the parties did not mutually agree to terminate the relationship; and that all of the details of the parties' telephone conversation were not confirmed in the letter. Accepting these facts as true we conclude that they do not affect the outcome in this case, and thus the facts at issue cannot be material.

## B. The Distributor Agreement Was Terminable At Will

Peachtree sets forth a straightforward argument that the oral agreement in this case contained no conditions for termination and thus was terminable at will. In support of this argument Peachtree relies on the deposition testimony of Shuster's witnesses.

The Chief Executive Officer and owner of Shuster's, Anthony Shuster, testified as follows:

> **Q.** Was there an agreement – was there an understanding about the circumstances under which you could stop being a Peachtree distributor if you didn't want to be a Peachtree distributor anymore?
> **A.** To my recollection it was never discussed.
> **Q.** What about the flip side. Was there any understanding as to if Peachtree didn't want you as a distributor anymore the conditions under which they would not have to have you as a distributor anymore?
> **A.** Not that I was aware of.

(Deposition Testimony of Anthony Shuster, at 18-19.) Shuster's Vice President of Sales, James Vogel, offered similar testimony:

**Q.** Prior to the time that an agreement was reached between Peachtree and Shuster's, was there any conversation that you recall about the circumstances under which Shuster's could resign and stop being a Peachtree distributor if that was the decision you decided to make?
**A.** Never talked about that kind of stuff. . . .

* * *

**Q.** Any conversations about the circumstances under which you guys could walk away if you wanted to walk away?
**A.** No. That wasn't part.
**Q.** What about the flip side here. Were there any discussions about the circumstances under which Peachtree could say we don't want Shuster's anymore?
**A.** No. Those early meetings, it was just like a marriage, you know, like we wanted each other. There was never a thought, what if we don't want you in the future.

(Deposition Testimony of James Vogel, at 31-33.) As we concluded above, there is no genuine issue of material fact that the Distributor Agreement did not contain a specific period of duration or conditions for termination. As already explained, Shuster's presents a legal argument that the conditions should nonetheless be implied or imposed.

Shuster's argues that over time the "parties' oral agreement supplemented by the ordinary course of dealing, common understanding, industry practice, and the circumstances surrounding the relationship between Shuster's and Peachtree created an implied contract with respect to Shuster's ongoing status as a Peachtree distributor." (Shuster's Memorandum in Opposition, at 3.) In addition, Shuster's notes that Peachtree "makes no mention as to the uniqueness of a distributorship agreement." (Id. at 6.) Shuster's also explains that it "nurtured" the distributorship agreement by hiring an employee dedicated to the Peachtree line, purchasing a truck advertising the Peachtree logo, and purchased literature and television advertising featuring Peachtree's name and products. (Id. at 7.) Shuster's argues that the actions it undertook were "prescribed conditions" of the oral agreement that were necessary for Shuster's to carry on their contract with Peachtree. (Id., citing

King of Prussia Equipment Corp. v. Power Curbers, Inc., 158 F.Supp.2d 463 (2001) and Slonaker v. P.G. Publishing Co., 13 A.2d 48 (1940).) Finally, Shuster's argues that a "terminating party is required to provide the other party reasonable notification of [] termination in order to [allow the other party] to seek substitute arrangements." (Id., citing U.C.C. § 2-309(3) & Mastrian v. William Freihofer Baking Co., 58 Luz.L.R. 221, 45 Pa. D. & C.2d 237, 240 (1968).)

**1. Shuster's Allegations of "Prescribed Conditions" of the Agreement**

Peachtree is correct that Shuster's reliance on King of Prussia Equipment Corp. v. Power Curbers, Inc., 158 F.Supp.2d 463 (2001) is misplaced. The only way that Shuster's argument would apply here is if the actions it asserts it undertook to nurture the relationship were actually conditions of the agreement that in fact constrained termination of the agreement. However, Shuster's offers no evidentiary support that there existed "prescribed conditions" of the oral agreement that were necessary for the continuation of the agreement. Shuster's merely asserts that it undertook certain actions to nurture the agreement, such as hiring a dedicated Peachtree employee and purchasing literature and advertising, and then jumps to the conclusion that its actions became conditions of the agreement.

There is no record evidence that the parties here had an agreement that their relationship would not be terminated so long as Shuster's performed the above-mentioned actions. Nor is there any record evidence that Shuster's and Peachtree ever agreed that the duration of the Distributor Agreement depended upon Shuster's performing the above-mentioned actions. Finally, there is no record evidence that Peachtree required Shuster's to perform the above-mentioned actions as a condition of the Distributor Agreement. The only relevant record evidence is that of Anthony

Shuster and James Vogel, both of whom testified that the parties' agreement did not contain conditions for a specific period of duration or conditions for termination.

**2. Applicable Law**

"[U]nder Pennsylvania law sales contracts that do not specify a definite duration are terminable at will by either party." Norris Sales Co. v. Target Division of Diamant Boart, Inc., 2002 U.S. Dist. LEXIS 23840, *7 (E.D. Pa. 2002)(citing 13 Pa. Cons. Stat. Ann. § 2309(b)). Section 2309(b) of Pennsylvania's Commercial Code provides in relevant part as follows:

> **§ 2309. Absence of specific time provisions; notice of termination**
> . . .
> (b) DURATION OF PROVISION FOR SUCCESSIVE PERFORMANCES. --Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.

13 Pa.C.S. § 2309(b).

The Pennsylvania Supreme Court interpreted section 2309(b) of the Code in holding that "an oral agreement between a beer distributor and brewer, which failed to specify contract duration, was terminable at will by either party." Norris, 2002 U.S. Dist. LEXIS 23840, *8 (citing Weilersbacher v. Pittsburgh Brewing Co., 421 Pa. 118, 218 A.2d 806, 808 (Pa. 1966). As explained by the Norris Court, in the Weilersbacher case

> the parties had maintained a sales relationship for many years, during which the distributor had invested much time and money in the furtherance of its business. In 1963 plaintiffs and defendant entered into an oral contract in which defendant agreed to sell it products to the plaintiffs for cash at an agreed price schedule. A year later, defendant arbitrarily terminated the contract and refused to sell any goods to plaintiffs. Although the Weilersbacher Court recognized that sales contracts with successive performances such as distributorship agreements are valid for a reasonable amount of time when no party seeks to end the relationship, this determination did not undermine the Court's ultimate conclusion that the agreement was nevertheless terminable at will.

Norris, 2002 U.S. Dist. LEXIS 23840, *8 (citations to Weilersbacher, 218 A.2d at 807-808 omitted).

The circumstances in Norris were similar. In Norris, Norris Sales, a distributor of construction equipment and supplies, entered into a distributor agreement with Target for the purchase of certain asphalt cutting and coring equipment. Norris, 2002 U.S. Dist. LEXIS 23840, *2. Target orally offered Norris Sales the distributorship, and Norris Sales accepted. The parties negotiated various terms of the agreement, some of which were written down and some of which remained as part of the oral agreement. As set forth in the President of Norris Sales' affidavit, the terms of the agreement were as follows:

> 'Among other things, we agreed upon discount pricing for all purchases by Norris Sales, we agreed upon shipping arrangements and discounts and we agreed that Norris Sales would participate in the co-op advertising program sponsored by [Target] . . . to promote and advertise Target products during the following year. We also discussed and agreed upon things such as the establishment of inventory by Norris Sales, the marketing and advertising efforts Norris Sales would undertake and the training that Norris Sales employees would undergo. In sum, I and Mr. Morgan agreed that Norris Sales would use its best efforts to sell and promote [defendant's] Target line of Products in the selling region by setting up a complete and integrated distribution system and in return [Target] would sell and supply the [Target] line of products to Norris Sales at the stated discounts.'

Norris, 2002 U.S. Dist. LEXIS 23840, *2-*3 (quoting Affidavit of Donald Zajick, at 10.) In addition, both parties had expressed their desire that they would have a long term relationship. (Id. at *3). Norris Sales' eventually placed an order for Target products and both sides met to begin training Norris Sales' employees and scheduled further training sessions. The parties also discussed business and marketing plans while Norris Sales began stocking Target inventory, rearranging

showrooms to display the Target products, updating its computer system, and marketing Target Products to customers. The parties were only a few months into the agreement when Target informed Norris Sales that it would no longer sell its products to them.

Norris Sales' argued against summary judgment by claiming that under Pennsylvania law the distributorship agreement "had to endure for a reasonable amount of time for plaintiff to recoup its investment of time and money." (Id. at *7-*8.) The District Court, however, citing the relevant Pennsylvania law and noting that the Weilersbacher case was directly on-point, determined that because the parties' agreement did not specify a definite duration it was terminable at will, and thus summary judgment was appropriate. (Id. at *8,*9.)

We note that Shuster's failed to address any of the relevant law set forth by Peachtree. Most likely because the instant case is nearly identical to both Norris and Weilersbacher. The parties here entered into an oral agreement that did not specify a definite duration and contained no conditions under which a party could terminate the agreement. Therefore, under Pennsylvania law the Distributor Agreement was terminable at will. Like in Norris, this conclusion is not changed even though Peachtree and Shuster's agreed upon other terms and conditions; Peachtree and Shuster expressed a wish that the relationship be long-term; or that Shuster had invested time and money in promoting Peachtree's products. It is the absence of a specific period of duration and the lack of conditions of termination that renders the agreement terminable at will. Accordingly, we will grant Peachtree's motion for summary judgment on Shuster's breach of contract claim.

**C. Claim for Breach of Duty of Good Faith and Fair Dealing**

Next, Peachtree moves for summary judgment as a matter of law as to Shuster's claim for breach of the duty of good faith and fair dealing. Peachtree argues that such a duty does not apply to

a contract terminable at will. (Peachtree's Memorandum in Support of Motion for Summary Judgment, at 10-11, citing King of Prussia Equipment Corp. v. Power Curbers, Inc., 117 Fed. Appx. 173 (3d Cir. 2004).) In addition, Peachtree argues that Pennsylvania law does not permit a plaintiff to assert such a claim when the underlying facts of the claim also support the plaintiff's breach of contract claim. (Id. at 11-12, citing, *inter alia*, Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000).)

Again, Shuster's does not directly address Peachtree's argument. Shuster's entire argument in opposition, such as it is, is as follows:

> [T]he Plaintiff's claim of breach of good faith and fair dealing arises out of the nature of the distributorship agreement. Shuster's reasonable expectation was to be involved in a distributorship agreement with Peachtree for such a period of time that they could at least recoup their investment in the Peachtree brand. Indeed, Shuster's acted in good faith in attempting to achieve this goal, and made efforts to sustain their relationship with Peachtree. According to Pennsylvania law, a franchisor has been held to have an independent contractual duty to act in good faith[.] Kuglowski [sic] v. GNC, 20[0]2 LW [sic] 32131024 (W.D.Pa. [2002]). As such, Peachtree breached [its] independent contractual duty to act in good faith by terminating the distributorship agreement.

(Shuster's Memorandum in Opposition, at 8-9.) Again we are provided no record evidence to support Shuster's assertions about the conditions of the agreement or the nature of the agreement, and Shuster's does not develop its argument. In addition Shuster's does not acknowledge Peachtree's well-founded legal arguments supported by case law. Shuster's does not even bother to expand on its reliance on Kuligowska v. GNC Franchising, Inc., 2002 WL 32131024 (W.D.Pa. November 25, 2002), apparently realizing, as did Peachtree, that Kuligowska "offers absolutely no support for Shuster's position." (Peachtree's Reply Brief, at 8 (explaining that Kuligowska holds that franchisees may state a claim for breach of implied covenant of good faith and fair dealing

where the franchisor engaged in an unlawful scheme to induce prospective franchisees into purchasing franchises and then intentionally drove them out of business after collecting franchise fees and royalties).) We can reach no other conclusion than that Shuster's presented the above argument in lieu of an explicit concession. Accordingly, we will grant Peachtree's motion for summary judgment on this claim also.

**IV. Conclusion**

For the reasons stated above, we conclude that summary judgment is appropriate with regard to Shuster's claims. An appropriate Order will be entered.

September 25, 2006
Date

Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.,
Senior District Judge